# UNITED STATES DISTRICT COURT

## DISTRICT OF ALASKA

Tracey Crockett, *et al.*,                     )
                  Plaintiffs,       )      **3:18-CV-00179 JWS**
            **vs.**       )      **ORDER AND OPINION**
                    )      **[Re: Motions at docket 49, 53]**
NEA-Alaska, *et al.*,                          )
                **Defendants.**      )

## I.  MOTIONS PRESENTED

At docket 49, Defendants NEA-Alaska, National Education Association, and
Matanuska-Susitna Education Association ("Union Defendants") move to dismiss all of
Plaintiffs' claims against them.  They argue that Plaintiffs' claim for prospective relief
with respect to compulsory payments to unions must be dismissed pursuant to
Rule 12(b)(1) for lack of subject matter jurisdiction.  They argue that Plaintiffs' § 1983
claim and Alaska tort claims for retrospective monetary relief in relation to these
compulsory payments must be dismissed under Rule 12(b)(6) for failure to state a
claim.  They argue that Plaintiff Kathryn McCollum's claim challenging Alaska's system
of exclusive representative collective bargaining and asking for prospective relief and
treble damages must also be dismissed under Rule 12(b)(6).

At docket 53, Defendant Matanuska-Susitna Borough School District ("School
District") joins the Union Defendants' motion to the extent it addresses the more limited
claims against it.  Plaintiffs only seek prospective relief against the School District with

respect to its collection of compulsory union payments and with respect to its exclusive collective bargaining activities.

Plaintiffs[1] respond at docket 56. Plaintiffs concede that the court lacks jurisdiction over their claims for prospective relief with respect to compulsory union payments, but they maintain that they are entitled to retrospective monetary relief for the past collection of these payments. Plaintiff McCollum concedes that Supreme Court precedent bars her constitutional challenge to exclusive representative collective bargaining but maintains her challenge to such a system based on federal antitrust laws.

The Union Defendants reply at docket 58. The School District replies at docket 59. Oral argument was heard February 15, 2019.

## II. BACKGROUND

Alaska's Public Employment Relations Act ("PERA") authorizes bargaining units of public employees to choose to be exclusively represented by a labor union for purposes of bargaining with public employers as to employment terms.[2] To cover the costs of union representation, PERA authorized public employers and unions to agree that all represented employees would pay their proportionate share of the costs of representation, regardless of union membership.[3] That is, a union could require through its collective bargaining agreement that public employers collect "fair share fees" from non-union members that would be remitted to the union to apply towards its bargaining activities. In the event an employee qualified as a religious objector to union activities under PERA, a bargaining agreement could nonetheless require that the

---

[1] Plaintiffs in this case at this time include Timothy Christopherson, Kathryn McCollum, David Ness, Carol Carman, Dolores McKee, and Donn Liston. The lead Plaintiff in the case caption, Tracey Crockett, has been terminated from the case. If the parties wish to remove Plaintiff Crockett from the court's official caption, a motion to amend the caption must be filed with the court.

[2] AS 23.40.100(b).

[3] AS 23.40.110(b).

employee pay a fair-share fee to the union, but the union had to donate the amount of that fee to a charity of its choosing.[4]  Until recently, such fair-share fees were explicitly authorized by Supreme Court precedent, *Abood v. Detroit Board of Education*.[5]  *Abood* held that public employees may be required to pay their proportionate share of the costs of union representation for collective bargaining purposes.[6]

Matanuska-Susitna Education Association ("MSEA") is the union that represents a bargaining unit of the School District's employees.  Plaintiffs McCollum and McKee are employees in that bargaining unit.  The agreement between the School District and the employees includes a fair-share provision that required the School District to deduct fees from its payments to non-union members and remit them to MSEA.  Plaintiff McCollum was not a union member at the time Plaintiffs filed their complaint; therefore, she was required to pay fair-share fees.  Plaintiff McKee was a union member at the time.  She alleges that she has long opposed the union but chose to remain in it because she otherwise would have had to pay a fair-share fee "and the difference in money between the full membership dues and the [fair-share fees] would not have been worth the loss of [her] vote and . . . influence . . . in collective-bargaining matters."[7]

The other plaintiffs are current or former public school teachers that worked in other school districts and were represented by NEA-Alaska affiliate unions for collective bargaining purposes.  Plaintiffs Ness and Christopherson were compelled to pay non-union member fair-share fees to their representative union.  Plaintiff Carmen was not a union member but was compelled, as a religious objector under AS 23.40.225, to

---

[4]AS 23.40.225.

[5]431 U.S. 209 (1977).

[6]Under *Abood*, payments may be compelled from non-union members for collective bargaining activities but not for "ideological activities unrelated to collective bargaining."  *Id.* at 236.

[7]Doc. 44 at ¶ 38.

pay fees to the union for charitable purposes. Plaintiff Liston is a retired teacher who had been a union member during his career but, like Plaintiff McKee, alleges that he only became one because he otherwise would have been required to pay fair-share fees.

On June 27, 2018, the Supreme Court issued its decision in *Janus v. AFSCME*,[8] which overruled *Abood* and held that requiring non-union members to pay union fees as a condition of public employment "violates the First Amendment and cannot continue."[9]

On August 2, 2018, Plaintiffs filed suit under 42 U.S.C. § 1983, Alaska common law, and federal antitrust law. Their complaint can be divided into four different requests: (1) a request for declaratory and injunctive relief to prevent the future collection of fair-share fees, including religious objector fees; (2) a request that the Union Defendants be required to refund all fair-share fees collected prior to *Janus*; (3) a request that the Union Defendants be required to refund a portion of union membership dues paid by Plaintiffs McKee and Liston; and (4) a request for prospective relief that would make Alaska's exclusive representative collective bargaining system unlawful and prevent its future use, as well as a request for treble damages to public employees who have not been allowed to negotiate on their own behalf.

### III.  STANDARD OF REVIEW

Rule 12(b)(6) tests the legal sufficiency of a plaintiff's claims. In reviewing such a motion, "[a]ll allegations of material fact in the complaint are taken as true and construed in the light most favorable to the nonmoving party."[10] To be assumed true, the allegations, "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the

---

[8]138 S. Ct. 2448 (2018).

[9]*Id.* at 2486.

[10]*Vignolo v. Miller,* 120 F.3d 1075, 1077 (9th Cir. 1997).

-4-

opposing party to defend itself effectively."[11] Dismissal for failure to state a claim can be based on either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."[12] "Conclusory allegations of law . . . are insufficient to defeat a motion to dismiss."[13]

To avoid dismissal, a plaintiff must plead facts sufficient to "'state a claim to relief that is plausible on its face.'"[14] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[15] "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."[16] "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"[17] "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief."[18] "In all

---

[11]*Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

[12]*Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

[13]*Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001).

[14]*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[15]*Id.* (citing *Twombly*, 550 U.S. at 556).

[16]*Id.* (citing *Twombly*, 550 U.S. at 556).

[17]*Id.* (quoting *Twombly*, 550 U.S. at 557).

[18]*Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009); *see also Starr*, 652 F.3d at 1216.

cases, evaluating a complaint's plausibility is a 'context-specific' endeavor that requires courts to 'draw on ... judicial experience and common sense.'"[19]

In deciding whether to dismiss a claim under Federal Rule of Civil Procedure 12(b)(6), the Court is generally limited to reviewing only the complaint, but may review materials which are properly submitted as part of the complaint and may take judicial notice of undisputed matters of public record that are outside the pleadings.[20]  Furthermore, documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss.[21]

## IV.  DISCUSSION

**A.**     **Prospective relief with respect to compulsory union fees**

Plaintiffs concede in their response brief that they cannot seek injunctive relief against the Union Defendants and the School District to prevent the future collection of compulsory union fees because there is not a current controversy to be resolved on this point.[22]  The day *Janus* was announced, NEA-Alaska sent a letter to all non-union members in bargaining units represented by its local affiliates to inform them that it would cease collecting fair-share fees.  It informed them that any such fees that had been collected in advance—to cover the period falling after the *Janus* decision date up to the end of the fiscal year—would be refunded.  Refund checks were mailed the next day.  NEA-Alaska local affiliates contacted school districts to notify them to immediately

---

[19]*Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (quoting *Eclectic Props. E., LLC v. Marcus & Millichap Co.,* 751 F.3d 990, 996 (9th Cir. 2014)).

[20]*See Gonzalez v. First Franklin Loan Services*, 2010 WL 144862, at *3 (E.D. Cal. Jan. 11, 2010) (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001); *Campanelli v. Bockrath*, 100 F.3d 1476, 1479 (9th Cir. 1996); *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986)).

[21]*Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994) *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

[22]Doc. 56 at p. 41.

stop deducting fair-share fees.  Given that it is undisputed that the collection of fair-share fees ceased immediately after *Janus*, there is no actual, live controversy sufficient to establish this court's jurisdiction over Plaintiffs' claims for prospective relief with respect to fair-share fees.[23]

**B.      Monetary relief with respect to compulsory fees collected pre-*Janus***

Plaintiffs ask for monetary damages under § 1983 for the Union Defendants' collection of fair-share fees pre-*Janus*.  They assert that the court's *Janus* decision is retroactive under *Harper v. Virginia Department of Transportation*.[24]  Consequently, Plaintiffs assert that the Union Defendants' past collection of fair-share fees from them, as non-members, was a constitutional deprivation for which they are entitled to § 1983 damages.  The Union Defendants contend that *Janus* was not meant to have a retroactive effect, but they note that the court need not make an affirmative ruling on the issue because regardless of how the civil retroactivity doctrine applies to the case, the good faith defense excuses them from liability under § 1983.  They argue that they are shielded from monetary liability because they collected fair-share fees according to a presumptively valid state statute and as authorized under then-binding Supreme Court precedent, *Abood*.

As private defendants acting under the color of state law, the doctrine of qualified immunity from § 1983 suits is not available to the Union Defendants.  The Supreme Court in *Wyatt v. Cole*[25] held as much based on the fact that the rationales justifying the

---

[23]*See Timbisha Shoshone Tribe v. Dep't of Interior*, 824 F.3d 807, 812 (9th Cir. 2016) (discussing how the court's jurisdiction is premised on there being an actual controversy to resolve). Recent district court cases in this circuit have also dismissed claims for prospective relief with regard to compulsory union fees post-*Janus* for lack of current controversy. *See Danielson v. Inslee*, 345 F. Supp. 3d 1336, 1338-40 (W.D. Wash. 2018); *Danielson v. AFSCME Council 28*, 340 F. Supp. 3d 1083, 1084 (W.D. Wash. 2018); *Cook v. Brown*, No. 6:18-cv-01085, 2019 WL 982384, at *3-*4 (D. Or. Feb. 28, 2019); *Carey v. Inslee*, 3:18-cv-05208, 2019 WL 1115259, at *3-*4 (W.D. Wash. Mar. 11, 2019).

[24]509 U.S. 86 (1993).

[25]504 U.S. 158 (1992).

application of qualified immunity to government officials are not transferrable to private parties.[26]  However, in so holding, the Court did not foreclose "the possibility that private defendants faced with § 1983 liability . . . could be entitled to an affirmative defense based on good faith."[27]  The Court recognized that "principles of equity and fairness may suggest . . . that private citizens who rely unsuspectingly on state laws they did not create and may have no reason to believe are invalid should have some protection from liability."[28]  Since *Wyatt*, several circuit courts, including the Ninth Circuit, have relied upon the defense in shielding private defendants from liability.[29]  In *Clement v. City of Glendale,* the Ninth Circuit  relied on the good faith defense when it affirmed that a private defendant, a towing company, was entitled to summary judgment as to the plaintiff's § 1983 claim against it for towing her car in violation of the Fourteenth Amendment.  It held that the facts of the case supported the application of the defense: the towing company "did its best to follow the law" in that "the tow was authorized by the police department, conducted under close police supervision and appeared to be permissible under both local ordinance and state law."[30]

Plaintiffs argue that *Clement* contradicts a prior Ninth Circuit case, *Howerton v. Gabica*.[31]  They assert that *Howerton* makes "good-faith defenses . . . categorically inapplicable to private parties who violate section 1983."[32]  *Howerton*, which came

---

[26]*Id.* at 168.

[27]*Id.* at 169.

[28]*Id.* at 168.

[29]*Clement v. City of Glendale*, 518 F.3d 1090 (9th Cir. 2008); *Wyatt v. Cole*, 994 F.2d 1113 (5th Cir. 1993); *Vector Research, Inc. v. Howard & Howard Attorneys, P.C.*, 76 F.3d 692, 698-99 (6th Cir. 1996); *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1275-78 (3d Cir. 1994).

[30]518 F.3d at 1097.

[31]708 F.2d 380 (9th Cir. 1983).

[32]Doc. 56 at p. 16.

-8-

before *Clement*, held only that a private party cannot invoke the doctrine of qualified immunity from suit—a holding that the Supreme Court would later endorse in *Wyatt*. As noted above, the Court in *Wyatt* left open the possibility that private defendants could avail themselves of an affirmative defense based on good faith, a concept which the Court recognized as separate and distinct from qualified immunity.

Plaintiffs also argue that only private individuals, as opposed to private companies, can invoke good faith to protect themselves from § 1983 liability. They base such an argument on the fact that qualified immunity only applies to individual officials, not government entities. Again, however, qualified immunity is not the same as a good-faith affirmative defense. The rationale for qualified immunity—protecting individual officers from the threat of personal monetary liability for carrying out their duties—is admittedly not transferrable to private entities. However, other rationales, such as principles of equity and fairness, support the application of the defense to private entities in certain circumstances.[33] Moreover, *Clement*, the controlling case law in this circuit allowed a private entity to assert the good-faith defense.

Plaintiffs alternatively argue that if the defense is indeed available to private defendants in § 1983 cases, its application is nonetheless limited. They argue that under *Wyatt* the defense can only be applied to a constitutional claim if the claim is analogous to a common law tort that would have conferred similar defenses when § 1983 was enacted. They argue that the most analogous tort in this situation is conversion, and because conversion does not include an intent element, the good faith defense cannot apply. Like the other three district courts in the Ninth Circuit to consider this argument, the court disagrees with Plaintiffs' construction of the defense.[34]

---

[33]*See Wyatt*, 504 U.S. at 168-69; *Cook*, 2019 WL 982384, at * 6.

[34]*See Danielson*, 340 F. Supp. 3d at 1086; *Cook*, 2019 WL 982384, at *5-*6; *Carey*, 2019 WL 1115259, at * 6.

*Clement* did not interpret the defense in this limited manner. It applied the defense to a § 1983 claim without considering whether the common law would have conferred the defense with respect to an analogous tort. The court was clearly more "concerned about the inequities of holding the private towing company liable" when it subjectively and reasonably believed it was following the law.[35] Indeed, the impetus for such a defense is rooted in concerns about the unfairness that would result from holding private parties retrospectively liable under § 1983 for following the law. When the Supreme Court held that private parties using a process established by state statute can be considered state actors for purposes of § 1983, it recognized that private individuals could unfairly be held liable if the state law is later held to be unconstitutional and suggested that the "problem should be dealt with . . . by establishing an affirmative defense."[36] As noted by the Union Defendants, the approach propounded by Plaintiffs "would increase the potential for unfairness by permitting some defendants that rely on presumptively valid state laws to assert the defense while others could not, based solely on the elements of various nineteenth-century common law torts."[37]

Even if the court must find a common law analogue, conversion is not the most closely related tort. "The core element of Plaintiffs' First Amendment claim . . . is not that the Unions acquired property. Instead, [it] is premised upon their right not to be compelled by the government to associate with the Unions' expressive activities."[38] That is, their claim stems from the dignitary harm that comes from being compelled to support speech with which they disagree, not the taking of their property.

There are other common law torts with scienter elements that can be analogized to Plaintiffs' claim. Tortious interference with a contract is one such cause of action:

---

[35]2019 WL 982384, at *6.

[36]*Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 942 n.23 (1982).

[37]Doc. 58 at pp. 8-9.

[38]Doc. 58 at p. 11.

-10-

> The wages from which Plaintiffs' agency fees were deducted were a contractual debt owed to Plaintiffs by their employer under the collective bargaining agreement. In 1871, such a debt could not provide the basis for a conversion claim. Instead, a plaintiff would have had to pursue a claim based on the third party's interference with the employer's satisfaction of its contractual obligations--- and malice or lack of justification was an element of [that tort] at common law.[39]

Abuse of process is also analogous to Plaintiffs' First Amendment claim. It is a "cause of action against private defendants for unjustified harm arising out of the misuse of governmental processes."[40] Here, Plaintiffs' claim against the Union Defendants depends on the use of governmental processes: their "invocation of Alaska statutes authorizing deduction of agency fees from employees' paychecks and transmission of those fees to the [Union Defendants]."[41] At common law, an abuse of process claim requires the plaintiff to establish that the defendant acted with malice or without probable cause. Given the array of common law torts with scienter elements that can be analogized to Plaintiffs' claim, the good-faith defense would be available to the Union Defendants under Plaintiffs' approach.

Plaintiffs also assert that the defense is further limited in that it should only protect defendants from legal claims, as opposed to equitable ones. Plaintiffs argue that because they seek repayment from the Union Defendants based on equitable considerations, the defense cannot apply here. Plaintiffs' position is unavailing under the case law. Furthermore, as the Union Defendants persuasively argue in their reply brief:

> Plaintiffs had no expectation of receiving the fair share fees paid to the Unions, and Plaintiffs already have received the benefits of collective bargaining representation paid for with those fees. Requiring the Unions to pay those funds to Plaintiffs as an equitable remedy would 'stand[ ] that remedy on its head.'"[42]

---

[39]Doc. 58 at p. 11. *See also Danielson*, 340 F. Supp. 3d. at 1086.

[40]*Wyatt*, 504 U.S. at 164.

[41]Doc. 58 at p. 12.

[42]Doc. 58 at p. 18 (citing *Gilpin v. AFSCME*, 875 F.2d 1310, 1316 (7th Cir. 1989)).

Plaintiffs' argument is also flawed in that the relief they seek does in fact sound in law. Their fair-share fees paid for ongoing costs of representation the Union Defendants provided on their behalf. There is no segregated fund to which Plaintiffs' payments can now be traced, and therefore any relief would be paid from the Union Defendants' general assets. A "personal claim against the defendant's general assets . . . is a *legal* remedy, not an equitable one."[43]

Given that the good faith defense is indeed available to private defendants in § 1983 cases, the court must consider whether it in fact shields the Union Defendants from monetary liability here. In line with the three other district courts that have applied the defense under nearly identical facts, the court concludes that it does. As discussed above, "traditional principles of equity and fairness . . . underpin the [good faith] defense."[44] The Union Defendants collected fair-share fees in accordance with PERA and in accordance with then-binding Supreme Court precedent that upheld the constitutionality of such fees. "It would be highly inequitable to hold private parties retroactively liable for § 1983 damages in such a circumstance."[45]

Plaintiffs argue that the good faith defense should not apply to the facts here because the Union Defendants should have known that the Supreme Court was poised to overturn *Abood* given dicta in the Court's cases over the past six years. They argue it was beyond question that the Court had "grave misgivings about the constitutionality of public-sector agency shops" and the Union Defendants should not have continued to collect fees pursuant to these arrangements in the face of such uncertainty, which therefore precludes any argument that they collected fees in good faith.[46] But "reading the tea leaves of Supreme Court dicta has never been a precondition to good faith

---

[43]*Montanile v. Board of Trustees*, 136 S.Ct. 651, 658 (2016).

[44]*Cook*, 2019 WL 982384, at *7.

[45]*Id.*

[46]Doc. 56 at p. 25.

reliance on governing law."[47]  Barring the use of the good-faith defense on a private

defendant who relied on Supreme Court precedent to justify its conduct based on the

likelihood of the Supreme Court overruling that precedent would indeed "imperil the rule

of law."[48]

Plaintiffs argue that, if nothing else, it is improper to dismiss a claim based on the

good-faith defense pursuant to Rule 12(b)(6).  They assert that the defense is a

subjective one that requires evidence of the defendant's actual state of mind.

Therefore, they believe they need an opportunity to gather evidence as to what the

Union Defendants subjectively believed about the continued lawfulness of such fees;

that is, whether they understood such fees to be "constitutionally dubious."[49]  Such

evidence, they assert, would prove whether the Union Defendants were indeed acting

in good faith or whether they were just collecting as much money as they could before

the inevitable overruling of *Abood*.  Again, this argument has been considered and

correctly rejected as unworkable by the other courts addressing this same issue in

these circumstances:

> Admittedly, the subjective state of mind of a party asserting good faith is a
> common inquiry in cases discussing the defense. . . . But applying the
> subjectivity standard to this case results in a perverse outcome, if followed
> to its logical conclusion.  Assuming that the Union Defendant (or, more
> accurately, an employee of the union), subjectively believed the Supreme
> Court would *not* overrule *Abood*, the Union Defendant's collection of
> [fair-share] fees, up until *Janus*, would be shielded by the good faith defense,
> but not so if the same employee instead subjectively believed (correctly) that
> the Supreme Court *would* overrule *Abood*. . . . Inviting discovery on the
> subjective anticipation of an unpredictable shift in the law undermines the
> importance of observing existing precedent and ignores the possibility that

---

[47]*Cook*, 2019 WL 982384, at *7.

[48]*Id.; see also Carey*, 2019 WL 1115259, at *7 (noting that such a position on the good
faith defense would cause "chaos in constitutional interpretation").

[49]Doc. 56 at p. 25.

prevailing jurisprudential winds may shift. . . . The good faith defense should apply here as a matter of law.[50]

It is indisputable that the Union Defendants' collection of fair-share fees was lawful under state statute and then-binding Supreme Court precedent. No amount of discovery would prove otherwise.

Relatedly, Plaintiffs argue that dismissal is premature because the Union Defendants have not shown that its pre-*Janus* collection of fees from non-union members complied with *Abood's* restriction on the use of these fees for non-ideological activities only. They assert that discovery is needed on this compliance issue before the Union Defendants can establish a good-faith defense. Their argument is without merit. As noted by the Union Defendants "Plaintiffs do not allege the Unions failed to comply with *Abood*. Instead, Plaintiffs seek a refund of all fees the Unions received in *reliance* on *Abood*."[51] Their argument that discovery is needed on a different claim for different relief on a different class before the court can apply the good-faith defense simply does not track.

**C.    Monetary relief for union dues collected pre-*Janus***

Plaintiffs McKee and Liston were union members who paid union membership dues rather than fair-share fees. They allege that they only became members because they otherwise would have been forced to pay fair-share fees and the difference between the amount of the membership dues and the amount of the fair-share fees "would not have been worth the loss of their vote and whatever little influence they might have been able to exert in collective bargaining matters."[52] That is, they believe the existence of the "unconstitutional agency shop" structure and its accompanying

---

[50]*Danielson*, 340 F. Supp. 3d at 1086; *see also Carey*, 2019 WL 1115259, at *7 (stating that "good faith may be decided as a matter of law when the defendant relied upon a valid statute").

[51]Doc. 58 at p. 17.

[52]Doc. 44 at ¶ 38.

-14-

fair-share fees compelled their union membership. They seek a refund of a portion of their union membership fees exceeding the amount of the fair-share fees paid by non-union members. Given that the union members' claim is also based upon pre-*Janus* collection of fair-share fees, the court concludes that the good-faith defense applies here as well.

Other reasons support denial of the union members' claims. First, they admit that they made a decision to pay union membership dues in exchange for certain benefits: a right to vote in union elections and the ability to influence collective bargaining efforts. This voluntary choice precludes an argument that they were compelled to subsidize the Union Defendants' private speech. Indeed, "Janus says nothing about people who join a union, agree to pay dues, and then later change their mind about paying union dues."[53] Their assertion that their union memberships were compelled because they should have had the option to avoid union fees altogether, as *Janus* now makes clear, is unpersuasive. The fact that plaintiffs would not have opted to pay union membership fees if *Janus* had been the law at the time of their decision does not mean their decision was therefore coerced.

Second, Plaintiffs McKee and Liston's agreement to become union members in exchange for benefits created a contract between them and their unions that remains enforceable after *Janus*.[54] Plaintiffs cannot "seek to claw back money paid in exchange for already-provided contractual benefits . . . based on later changes in the law."[55] Plaintiffs argue that the Union Defendants cannot rely on this contractual argument to support dismissal under Rule 12(b)(6) because the contract is not described or referenced in the complaint. However, the complaint admits that Plaintiffs McKee and

---

[53]*Belgau v. Inslee*, No. 18-5620, 2018 WL 4931602, at *5 (W.D. Wash. Oct. 11, 2018).

[54]*Fisk v. Inslee*, No. C16-5889, 2017 WL 4619223, at *5 (W.D. Wash. Oct. 16, 2017).

[55]Doc. 50 at p. 33; *Coltec Indus., Inc. v. Hobgood*, 280 F.3d 262, 277 (3d Cir. 2002).

1    Liston agreed to pay union membership dues in exchange for membership benefits.

2    This admission alone supports the Union Defendants' contractual argument.

3    **D.    Monetary relief under Alaska common law**

4          Plaintiffs argue that they are entitled to a refund of pre-*Janus* fair-share fees and

5    dues under state tort law, specifically conversion and trespass to chattels, as well as

6    "replevin, unjust enrichment, restitution, and any other legal or equitable cause of action

7    that offers relief for the unlawful seizure of their personal property."[56]  The Union

8    Defendants are entitled to have these state law claims dismissed under Rule 12(b)(6),

9    because there can be no common law liability for conduct authorized by state statute.

10   Plaintiffs do not dispute that PERA authorized fair-share fees, and the Alaska Labor

11   Relations Agency, pursuant to PERA, promulgated regulations setting forth the

12   procedures for collecting fees.  This "comprehensive system to govern labor relations

13   for public employees that includes fair-share fees . . . displaced any contrary common

14   law in this area."[57]  Pursuant to *Janus*, the federal Constitution prohibits the continued

15   enforcement of fair-share fee requirements under PERA; however, *Janus* "did not

16   change the Alaska Legislature's determination that fair-share fees do not violate state

17   law."[58]  That is, *Janus* does not change the fact that PERA displaced any state common

18   law tort claims that could have been brought with regard to fair-share fees collected

19   prior to *Janus*.

20         Plaintiffs argue that because the statute is now unconstitutional it can no longer

21   "confer immunity on otherwise tortious conduct."[59]  The court disagrees.  It cannot

22

23         [56]Doc. 44 at ¶ 58.

24         [57]Doc. 50 at p. 36. *See* AS 01.10.010 ("So much of the common law not inconsistent
25   with . . . any law passed by the legislature of the State of Alaska is the rule of decision in this
     state."); *City of Homer v. Gangl*, 650 P.2d 396 (Alaska 1982) (noting that the adoption of an
26   applicable statute "prevails over the principles of common law").

27         [58]Doc. 50 at p. 37.

28         [59]Doc. 56 at p. 32.

ignore the fact that the Union Defendants' collection of fair-share fees prior to *Janus*
was authorized by state statute that was constitutional under controlling precedent. The
court cannot now go back and impose tort liability under common law for that conduct.
In any event, the court agrees with the Union Defendants that dismissal of Plaintiffs' tort
law claims is also warranted because Plaintiffs cannot establish the elements of the
various common law claims.[60]

**E.    Exclusive representative collective bargaining**

Plaintiff McCollum uses the Supreme Court's issuance of *Janus* as an
opportunity to challenge not only the Union Defendants' past collection of fair-share
fees but also to more broadly challenge Alaska's system of exclusive representative
collective bargaining. She contends that the *Janus* decision calls into doubt the
constitutionality of exclusive union bargaining.[61] She alleges that Alaska's exclusive
collective bargaining system infringes upon her associational freedoms because she
"remains bound to the terms of employment negotiated by a union that she does not
belong to and wants nothing to do with."[62]

Despite the dicta set forth in *Janus* that enticed Plaintiff McCollum to bring such
a First Amendment challenge, binding Supreme Court precedent flatly rejects her
position. In *Minnesota State Board for Community Colleges v. Knight*,[63] the Supreme
Court held that a system of exclusive union representation does not violate the speech
or associational rights of individuals who are not members of the union. Indeed, the
Court in *Janus* reaffirmed as much, distinguishing between compelled financial support
for a union's exclusive representation and the underlying system of exclusive union

---

[60]*See* doc. 50 at pp. 37-40; Doc. 58 at pp. 21-22 for reasoning that the court adopts
herein.

[61]Doc. 44 at ¶ 50.

[62]Doc. 44 at ¶ 49.

[63]465 U.S. 271 (1984).

representation and acknowledging that states can continue to require that a union serve as the exclusive bargaining agent for its public employees.[64]  Plaintiff McCollum now concedes that she cannot maintain her constitutional challenge to Alaska's system of exclusive union bargaining.  She, however, maintains that the system is nonetheless unlawful under federal antitrust law.

Plaintiff's antitrust theory is that collective bargaining agreements stemming from Alaska's PERA are anti-competitive because they require compensation based on union-imposed pay scales and prevent individual employees from negotiating compensation based on individual performance and merits.  Plaintiff fails to cite any case authority for her position.  Indeed, it does not stand to reason that "federal antitrust law prohibits Alaska from structuring labor relations for its public-sector employees in the same way that Congress structured labor relations for private-sector and federal government employees and that approximately 40 other states have structured their public employee labor relations."[65]  Federal antitrust law, which seeks to preserve competition in the private sector, simply does not encompass the way in which a state chooses to set employment terms for its public employees.  As to employees not covered by federal labor relations law, Congress left states "free to legislate as they see fit, and [to] apply their own views of proper public policy to the collective bargaining process."[66]

Several exemptions and doctrines of federal antitrust law bolster this court's conclusion that Plaintiff's claim falls outside the ambit of federal antitrust law.  First, antitrust laws do not "restrain a state or its officer or agents from activities directed by

_____

[64]138 S. Ct. at 2465-67, 2485 n. 27.

[65]Doc. 58 at p. 23.

[66]*United Farm Workers of Am. v. Ariz. Agric. Emp't Relations Bd.*, 669 F.2d 1249, 1257 (9th Cir. 1982).

-18-

its legislature."[67]  Plaintiff consequently cannot challenge PERA itself.  The legislature's adoption of this exclusive representative bargaining system is "an undoubted exercise of state sovereign authority" and is immune without further analysis.[68]

The collective bargaining agreements between the Union Defendants and school districts, which are a result of this legislatively authorized system, likewise cannot be challenged under antitrust laws.  Although non-state actors, the Union Defendants and school districts are undoubtedly carrying out the state's regulatory scheme through their collective bargaining, and the agreements that stem therefrom, and consequently enjoy state-action immunity from federal antitrust laws as to this conduct.[69]  There are no issues of fact to develop on this issue; that is, it is indisputable that the challenged restraint—a collective bargaining agreement negotiated by a representative union—is "clearly articulated and affirmatively expressed as state policy."[70]

Plaintiff argues that state immunity cannot be applied to dismiss her antitrust claim under Rule 12(b)(6) because the Union Defendants, as private actors, cannot avail themselves of the state-action immunity defense unless, in addition to carrying out state policy, they are actively supervised by the state in carrying out that policy, which is an issue not discernible on the face of the complaint.  The active supervision requirement, however, is inapplicable here because the other party to the challenged

---

[67]*Parker v. Brown*, 317 U.S. 341, 350-51 (1943); *see also Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 39 (1985) (noting that public entities such as municipalities are exempt from federal antitrust laws if their anticompetitive activities are authorized by state policy meant to displace competition with regulation).

[68]*N.C. State Bd. of Dental Exam'rs v. FTC*, 135 S. Ct 1101, 1110-11 (2015) (stressing that state legislation is an exercise of a state's sovereign power and therefore exempt from the operation of antitrust laws).

[69]*See Chamber of Commerce v. City of Seattle*, 890 F.3d 769, 781 (9th Cir. 2018) (discussing when the Supreme Court has extended state-action immunity to non-state actors).

[70]*Id.* at 782.  *See also Preferred Commc'ns, Inc. v. City of L.A.*, 754 F.2d 1396, 1414 (9th Cir. 1985) (stating that state-action immunity extends to actions that the legislature contemplated when authorizing the conduct at issue or that were a "necessary or reasonable consequent of engaging in the authorized activity").

collective bargaining agreement is the School District. "[U]nlike private parties, [local government] entities are not subject to the 'active state supervision requirement' because they have less of an incentive to pursue their own self-interest under the guise of implementing state policies."[71] A local government entity is entitled to a presumption that it "acts in the public interest" and consequently there is "little or no danger" that the entity would become "involved in a *private* price-fixing arrangement."[72]

Second, the labor of a human being cannot be a commodity whose price is protected under federal antitrust regulation.[73] Therefore, "restraints on the sale of the employee's services to the employer"—those employment terms set forth in a collective bargaining agreement—"are not themselves combinations or conspiracies in the restraint of trade or commerce under the Sherman Act" even if they "curtail the competition among employees."[74] Indeed, the Ninth Circuit has held that restraints in a collective bargaining agreement fall within the labor exemption to federal antitrust law.[75]

Third, the court is persuaded that the *Noerr-Pennington* doctrine also shields collective bargaining agreements from a federal antitrust challenge. Under the doctrine, efforts to convince the government to act in an anticompetitive manner are protected by the First Amendment. Federal antitrust law therefore does not "regulate the conduct of private individuals in seeking anticompetitive action from the government."[76] As long as the unions are not using the governmental process, as opposed to the outcome of the

---

[71]*FTC v. Phoebe Putney Health Sys. Inc.*, 568 U.S. 216 (2013) (citing *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 46-47 (1985)).

[72]*Hallie*, 471 U.S. at 45, 47.

[73]15 U.S.C. § 17.

[74]*Apex Hosiery Co. v. Leader*, 310 US 469, 503 (1940).

[75]*Bodine Produce, Inc. v. United Farm Workers Org. Comm.*, 494 F.2d 541, 558 (9th Cir. 1974).

[76]*City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 379-80 (1991).

-20-

process, as an anticompetitive weapon, negotiating with public officials for employment terms that may in fact restrict competition is exempt from federal antitrust liability.[77]

## V.  CONCLUSION

Based on the preceding discussion, the motions at docket 49 and 53 are GRANTED.  Plaintiffs' complaint is hereby dismissed in its entirety.

DATED this 14th day of March 2019.

/s/ JOHN W. SEDWICK
SENIOR JUDGE, UNITED STATES DISTRICT COURT

---

[77]*Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988); *see also Omni Outdoor Adver.*, 499 U.S. at 380.